## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

LORI A. THOMAS,            )
                                   )
           Plaintiff,        )
                                   )
vs.                        )     Case No. 10-cv-691-TLW
                                   )
MICHAEL J. ASTRUE,      )
Commissioner of the Social Security  )
Administration,          )
                                   )
           Defendant.     )

## OPINION AND ORDER

Plaintiff Lori A. Thomas, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her application for disability benefits under Title XVI of the Social Security Act ("Act").[1]  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge.  (Dkt. # 8).  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Background

Plaintiff was born July 3, 1972, and was 38 years old at the time of the Administrative Law Judge's ("ALJ") decision.  (R. 60, 204).  She is divorced with no children.  (R. 103).  She obtained a GED.  (R. 20, 67, 275).  Her prior work consisted of a fast food worker, and home health aide.  (R. 246).

---

[1]  Plaintiff filed a previous appeal with this court which was remanded for further development.  See 08-cv-293-TLW, Thomas v. SSA, September 30, 2009.  The instant case is an appeal of the Administrative Law Judge's revised decision again finding plaintiff not disabled.

**Hearing Summary**

A hearing was held June 17, 2010, in front of ALJ John Volz. At this hearing, plaintiff testified the reasons she could not work were "my knee, my back, my heart, and I have some mental health issues." (R. 394). She said she had not discussed her back pain with any doctor, as it did not usually hurt when she was at the emergency room. (R. 395). She also alleged knee pain, with no diagnosis. Id. She told the ALJ she walked approximately ten blocks before needing to rest with knee pain. (R. 396). After discussion with the ALJ as to the reasons why plaintiff did not attend one of the two consultative examinations set up for her (she received late notice first, then could not find a ride when the appointment was rescheduled), plaintiff told the ALJ she is unable to work due to "a heart problem" and "bipolar and anxiety disorder." (R. 404-405). She described symptoms of dizziness, nausea, pain, lightheadedness, and "get[ting] hot" in conjunction with the rapid heartbeat she experiences. (R. 410). She said her heart problem interferes with housework and that she is unable to do yard work. (R. 413). Plaintiff said her depression makes her want to stay in bed at least twice a week and reduces her appetite. (R. 415).

After assuring himself that plaintiff did not want to expound on any further topics, the ALJ turned his attention to the Vocational Expert ("VE").[2] (R. 418-422). The VE questioned plaintiff to get clarification of her job history. (R. 419). Then, the ALJ asked the VE if she were "familiar with the definition that Social Security places on sedentary work[3]," received a positive

---

[2] When asked if she had anything more to tell the ALJ about her situation, plaintiff had a small breakdown, telling the ALJ she felt he was "looking at [her] like [she was] ignorant and so [she] just d[id not] know what to say." (R. 417).
[3] Social Security's definition of "sedentary" work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking

response, and proceeded to ask her if any jobs existed in the regional or national economy which could be performed by a hypothetical person with plaintiff's education, background, and prior work experience, but who was limited to sedentary work, and further limited to simple, uncomplicated tasks with routine supervision. (R. 421). The VE said yes, and listed the jobs of polisher, DOT number 713.684-038; machine feeder, DOT number 694.686-010; and food and beverage order clerk, DOT number 209.567-014. Id. The ALJ then remembered that he had neglected to ask plaintiff about her weight, so he verified her current weight of 217 pounds, and asked if her weight inhibited her in any way. Plaintiff responded "[n]ot to my knowledge." (R. 421-422).

The ALJ then allowed plaintiff's attorney to question the VE. Plaintiff's attorney asked the VE if an individual with "the limitations that you heard here described today" would be capable of performing either plaintiff's past relevant work or the other work just described. (R. 422). The VE said if the days plaintiff claimed she did not want to get out of bed fell on scheduled work days, "there may be some question of long-term sustainability." (R. 423). Plaintiff's attorney requested a psychological consultative exam with testing. The ALJ denied the request, saying he found no reason to order the examination.[4] (R. 425).

**Non-Medical Records**

In a Function Report-Appeal form dated February 2, 2005, plaintiff said she lives with her grandmother. (R. 69). Her daily activities include caring for her grandmother, cooking, cleaning the kitchen and bathroom. She also cares for two dogs, feeding and giving them water,

---

and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).
[4] "The ALJ has broad latitude in determining whether to order a consultative examination." Winslow v. Apfel, 139 F.3d 913 (10th Cir. 1998); Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 778 (10th Cir. 1990).

letting them outside, and "sometimes [she] pick[s] up [the] yard." (R. 70). She stated she was able to wash the dishes, the laundry, sweep floors, clean the bathroom, and pick up the yard. (R. 71). She shops for groceries and dog food, and her grandmother pays the bills. (R. 72). She reads, and talks or visits with friends daily. (R. 73).

Plaintiff claims she is much less active as "at any given time, [she] might have to go to [the] ER." (R. 74). She claims she is unable to do any activity that might raise her blood pressure or strain her heart. Id. She can walk 2 or 3 blocks before having to stop and rest for approximately 20 minutes.

Plaintiff completed a pain questionnaire March 7, 2005. (R. 77-78). She stated she cared for two dogs daily, made the bed, walked to the mailbox daily, and assisted in the kitchen of the local Disabled American Veterans (DAV) chapter once a week. She claimed she could not "run to [sic] much or to [sic] fast," was unable to "bend over and come up," had to be careful not to get too excited or "worked up," and was unable to ride fair rides or horses. (R. 77). Describing the pain she felt, plaintiff stated the pain was in her chest, and felt "like something slam[med] into [her] chest from the inside out. Can't breath[e] for like 4 or 5 seconds. Then there [wa]s another catch with a tight feeling and [her] heart start[ed] beating very, very, very fast." Id. She claimed this condition could have her in the emergency room up to three times a week, or leave her alone for a week at a time, and she could be doing nothing at all and it would attack. She stated doctors told her mother when she was a child that she had a heart murmur, and would grow out of it. Plaintiff claimed instead the heart condition worsened as she aged, and stated she was 24 years old when she "found out [she] h[as] a bad heart." Id. Plaintiff claimed her pain affected movements of bending, squatting, stooping, reaching, standing, and sitting. She stated to relieve her pain, she goes to the emergency room to get medication injected. (R. 78). She

stated she takes no medication because she cannot afford $160.00 a month, and said, "Half the time I end up in the E.R. more often." Id.

In a Disability Report - Appeal form dated August 26, 2005, plaintiff reported no changes for better or worse to her condition, no new physical or mental limitations, no new illness, injuries, or conditions, that she had no new doctor appointments set, nor had she been to a doctor, hospital, or clinic for any physical or emotional problems. (R. 79-80). She reported no medication, and no new medical tests. (R. 82). Plaintiff made the same comments on a separate Disability Report - Appeal form dated June 13, 2006. (R. 86-92).

A medication form dated December 6, 2007, (R. 94) shows plaintiff taking only two tablets of over-the-counter aspirin daily.

In a Disability Report - Adult form dated June 2, 2007, plaintiff noted the conditions limiting her ability to work to be "fast heart beat of valve." (R. 216). She also claimed "mental" impairments in other agency records. (R. 93, 119, 148).

**Medical Records**

Plaintiff was referred to Oklahoma Heart Institute February 12, 2001 from O.U. Family Medicine. (R. 204). She was diagnosed with paroxysmal supraventricular tachycardia (PSVT) (occasional rapid heart rate). Brian M. Ramza, M.D.'s impressions were that plaintiff had a long history of palpitations with documented PSVT, heart rates greater than 180 beats per minute. He found her EKG testing to show "findings consistent with orthodromic reciprocating tachycardia utilizing a left lateral accessory pathway. Other possibilities do include an atypical AVNRT [atrioventricular nodal reentry tachycardia]." (R. 208). He noted plaintiff had a history of hypertension, which was under control, that plaintiff continued tobacco use, discussed the various risks with her, and noted a history of "near syncope" and dizziness associated with the

episodes of PSVT.  Id.  Dr. Ramza discussed plaintiff's medication options with her, and the options of testing and possible radiofrequency ablation.  She said she would consider her options.  He increased her medication of atenolol.  He also discussed smoking cessation options with plaintiff.[5]  Id.

On August 4, 2003 and December 2, 2003, plaintiff presented to Bristow Medical Center's emergency room with complaints of heart palpitations.  Each time, she was given IV medications and discharged to her home in good condition.  (R. 373).

Plaintiff presented to St. John-Sapulpa's emergency room on December 28, 2004, complaining of a "fast heart rate."  (R. 143-147).  Plaintiff received testing, IV medication, and was discharged home in good condition.  (R. 143-144).

Plaintiff was examined May 19, 2005 by William R. Grubb, M.D., for the Disability Determination Division.  (R. 96-102).  Dr. Grubb noted plaintiff to be 5'5" tall, weighing 205 pounds.  (R. 96).  After examination and discussion of plaintiff's subjective history, Dr. Grubb's impressions were "probable recurrent supraventricular tachycardia [SVT] for years, by client's history; history of psychiatric disorder by old records; history of variably elevated blood pressure; and chest discomfort."  (R. 97).  He listed an addendum to his report, saying "Gait is normal in terms of speed, stability, and safety.  Gait appears symmetrical and it appears likely she could walk a block or more."  Id.

On May 24, 2005, plaintiff presented to Larry Vaught, Ph.D. for an agency psychological evaluation.  (R. 103-106).  Dr. Vaught noted plaintiff was cooperative with good eye contact, that she used intelligible, fluent, and coherent speech, and had no obvious thought difficulties.

---

[5] There is a letter in plaintiff's records from Oklahoma Heart Institute dated September 11, 2002, informing plaintiff her account had been sent to a collection agency.  She was not denied treatment in this letter, but informed if she wished to remain a patient there, she needed to be prepared to pay in full at the time of treatment.  (R. 202).

Her affect was appropriate and her mood euthymic. (R. 104). Dr. Vaught summarized his conclusions stating in the area of social functioning, plaintiff presented with appropriate affect and euthymic mood, denied any psychiatric history, yet reported "some nervousness" relating to her finances and medical condition. He stated plaintiff reported that she limited her exertion due to SVT, but otherwise, plaintiff was independent. In the areas of sustained concentration and persistence, Dr. Vaught noted plaintiff did not exhibit any obvious abnormalities, that her remote memory and fund of general information appeared intact, and that calculations, abstraction, and basic judgment all appeared intact. (R. 104). He gave her the Axis ratings of Axis I: Adjustment Disorder with Anxious Mood (Provisional); Axis II: No Diagnosis; and Axis III: SVT (by history). (R. 105).

A Psychiatric Review Technique was performed by Burnard L. Pearce, Ph.D. on June 6, 2005. (R. 107-120). Dr. Pearce rated plaintiff on the category of 12.06, Anxiety-Related Disorders. He stated her condition was not severe. (R. 107). Dr. Pearce rated plaintiff to have no restrictions in daily activities, no difficulties maintaining social functioning, no difficulties maintaining concentration, persistence, or pace, and found insufficient evidence existed regarding episodes of decompensation. (R. 117). Dr. Pearce based his opinion on the consultative examination of Dr. Vaught. (R. 119). This report was affirmed on April 7, 2006 by Jamie B. Smith, Ph.D. Id.

Plaintiff again visited St. John-Sapulpa's emergency room on December 30, 2005, complaining of increased heart rate, and "midsectional" chest pain. Plaintiff was given medications and discharged in stable condition after 30 minutes. (R. 124).

On September 17, 2005, plaintiff again visited St. John's ER, complaining of chest pain with radiation (R. 132-140). Plaintiff received testing, and intravenous ("IV") medications

which resolved her pain, and was discharged home in stable condition. (R. 133). A Cardiac Analyzer Interpretative Report of the same date revealed "[n]o biochemical evidence of myocardial injury." (R. 138).

Plaintiff again presented to St. John's ER on February 16, 2006 with chest pain. (R. 165-172). Plaintiff received testing, IV medication, and was transferred to Hillcrest Hospital for further treatment. Intake notes from Hillcrest note plaintiff experienced an episode of SVT at work, with chest pain radiating to both arms and shoulders. Hillcrest noted plaintiff's "long-term noncompliance to meds due to having no money. Multiple admissions to the ER for the same symptoms and treatment. Currently, she is symptom free." (R. 174). These records indicate plaintiff smoked one pack of cigarettes a day for approximately 12 years. No murmurs were audible on examination of her heart. (R. 175). Lauren Devoe, M.D., of Hillcrest, noted her assessment and plan for plaintiff was to admit her to a telemetry bed, start her on Toprol for "rate control," order an OHI consult, an EKG, a chest x-ray, a complete metabolic profile, magnesium and phosphate level, an "echo and thallium scan," TSH level, fasting lipid panel, IV fluids, and a Social Service consult for financial reasons. (R. 176).

A consultative report dated February 17, 2006, signed by David Sandler, M.D., detailed plaintiff's long history of SVT. It was noted plaintiff failed to undergo an ablation procedure in 2001 as a curative measure for her SVT, "therefore, [she] has never had treatment for her tachycardia." (R. 177). Plaintiff had an echocardiogram performed which showed a "left ventricular ejection fraction of 60%. Absence of wall motion abnormalities, and trivial mitral and tricuspid regurgitation." Id. Plaintiff's cardiac risk factors were noted to be "hypertension, dyslipidemia, continued tobacco use, obesity, and family history of coronary artery disease." Id. Impressions were "[c]hest pain with typical and atypical symptoms of angina; [s]upraventricular

8

tachycardia responsive to adenosine (long RP tachycardia); [u]nknown ischemic status with myocardial perfusion scan pending; [e]jection fraction 65%; [r]isk factors for coronary artery disease including hypertension, dyslipidemia, continued tobacco use, obesity, and family history of coronary artery disease; [and] [g]astroesophageal reflux disease." The plan was to "[] evaluate myocardial perfusion scan to determine if there is an ischemic burden in this patient with multiple risk factors for heart disease; [w]ill discuss radiofrequency ablation with Dr. Sandler; [t]he risks, benefits, alternatives, and indications to radiofrequency ablation of supraventricular tachycardia have been discussed [with plaintiff]. All questions have been answered, and she wishes to proceed; [s]moking cessation; [d]aily aspirin." (R. 179-180).

Roger D. Des Prez, M.D. performed a "Gated Vasodilator Spect Thallium Myocardial Perfusion Study" on February 17, 2006. (R. 190). Dr. Des Prez noted plaintiff's sinus rhythm was within normal limits before the test. His conclusions after testing were an "abnormal electrocardiographic response to dipyridamole infusion, with symptoms of chest pain. Chest pain is a nonspecific reaction to dipyridamole, [and] [n]ormal SPECT thallium myocardial perfusion and gated wall motion study. There is no evidence of ischemia [inadequate circulation due to vessel blockage] or underlying infarction [tissue death due to lack of oxygen]. Resting left ventricular ejection fraction is estimated at 60-65%." (R. 190). He commented that an "[a]bnormal electrocardiographic response to dipyridamole is a concerning finding, occasionally indicating ischemia not evident on perfusion imaging. The predominance of information, however, suggests that electrocardiogram represents a false positive, and that there is a low risk for ischemic cardiovascular events in the near future, and that recent symptoms are likely nonischemic." Id. An echocardiogram was also performed February 17, 2006, which showed

normal left ventricular size and function, and "no hemodynamically significant valve disease." (R. 191).

On February 24, 2006, plaintiff presented to Oklahoma Heart Institute's Same Day Cardiology Clinic, complaining of chest discomfort since Dr. Sandler had performed a radiofrequency ablation the previous week. Upon examination, the physician's impression was "[s]tatus post radiofrequency ablation for supraventricular tachycardia, [s]hortness of breath, [a]typical chest pain, reproducible with a normal myocardial perfusion study on 02/17/06, [e]jection fraction of 60-65%." (R. 198). A limited echocardiogram was recommended, but plaintiff declined for financial reasons. Instead, an EKG was performed, showing normal sinus rhythm. Id. Plaintiff was given a work release. Id.

Plaintiff presented to St. John-Sapulpa's ER on June 4, 2007 for an ear infection in her right ear. (R. 158-163).

Plaintiff's last record is a visit to St. John-Sapulpa's ER on August 14, 2007 with knee pain. (R. 150-156). Her heart was noted to be within normal limits at this visit. (R. 150). After an x-ray, she was given an Ace bandage and a prescription of Lortab for pain, and then discharged home. (R. 155).

**Decision of the Administrative Law Judge**

At step one of the sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity ("SGA") since her alleged onset date of January 24, 2005. At step two, he found tachycardia and depression to be severe impairments. (R. 269). He found plaintiff's impairments of knee problems and back pain to be medically non-determinable, as they were not established through the medical evidence of record. (R. 270). At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or

equaled a listed impairment, specifically focusing on section 4.05, pertaining to recurrent arrhythmias, and section 12.04, affective disorders. Before moving to step four, the ALJ found plaintiff retained the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 416.967(a) except the claimant is able to perform simple routine tasks with routine supervision.

(R. 271-272). At step four, the ALJ determined plaintiff was unable to perform any of her past relevant work. (R. 275). The ALJ found plaintiff to be a younger individual with a high school education and further found that transferability of job skills was not relevant, because use of the Grids found plaintiff "not disabled" whether or not her skills were transferrable. (R. 275-276). Finally, at step five, the ALJ found, based on testimony from the vocational expert ("VE"), that other jobs existed in the national and regional economies which plaintiff could perform, such as polisher, machine feeder, and food and beverage order clerk. (R. 276). As a result, plaintiff was found not disabled from January 24, 2005 through the date of the ALJ's decision. Id.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in

detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. § 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 416.913(a).

## Issues on Appeal

Plaintiff argues that the ALJ's decision should be remanded with instruction or for an award of benefits due to the following alleged errors:

1. The ALJ failed to perform a proper determination at step 5 of the sequential evaluation process; and

2. The ALJ failed to perform a proper credibility determination.

(Dkt. # 12 at 2).

## Discussion

### The ALJ's Step 5 Analysis

1. Faulty hypothetical

Plaintiff first alleges that the ALJ propounded a faulty hypothetical to the VE because the hypothetical failed to contain "any limitations on the hypothetical person's ability to lift, sit, stand, or walk." Id. Plaintiff fails to specify how this perceived error is harmful, simply stating the "ALJ's hypothetical simply had no specific limitations for any of the physical demands, as required." Id. Plaintiff cites to the previous district court decision which remanded her case back to the Social Security Administration with instruction to the ALJ to "exercise his discretionary power to order a consultative examination of plaintiff to determine her physical capabilities," and that the "consultant should provide opinion evidence as to plaintiff's capacity for walking, standing, sitting, bending, stooping and climbing, etc.," especially taking into account her obesity and level of fatigue. (Dkt. # 12-1 at 10).

The ALJ did order the required consultative examination. (R. 350-351). Plaintiff did not attend the originally scheduled exam date due to late notice, and the examination was rescheduled. Plaintiff did not attend the rescheduled examination because she was unable to find a ride to Oklahoma City. Plaintiff testified she does not drive because she does not have a car.

(R. 243). According to 20 C.F.R. § 416.918(b), this is not an acceptable reason for failing to appear for a scheduled consultative examination. 20 C.F.R. § 416.918(a) states "[i]f you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind." Id.

The ALJ also noted in his decision that he considered plaintiff's obesity:

> The ALJ has also placed emphasis on SSR 02-1p: Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity (Sept. 12. 2002) and the combined effects of the obesity with the depression impairment and any additional and cumulative effects of the obesity on the claimant's impairments. Based upon this analysis, the ALJ finds that the claimant's impairments, whether singly or in combination, do not meet or equal the criteria established for an impairment shown in the Listing of Impairments in Appendix I, Subpart P, Regulations No.4.

(R. 270). Further, the ALJ elicited testimony from plaintiff about her weight (217 pounds), who specifically stated her obesity did not in any way inhibit her movement. (R. 422).

The Commissioner responded to this allegation of error by stating the ALJ is not required to address or assess exertional requirements when the medical record provides no evidence of a limitation, citing Rutledge v. Apfel, 230 F.3d 1172, 1175 (10th Cir. 2000). The ALJ discussed plaintiff's subjective complaints of knee and back pain at step three, finding both medically non-determinable due to lack of any medical evidence to support them throughout the record. (R. 271). An ALJ need only credit those limitations that are supported by evidence in the record. Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995). Hypothetical questions that assume unsupported allegations do not bind the ALJ. Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993).

Because plaintiff failed to attend the ordered consultative examination and also failed to provide her own evidence of any alleged impairments which would affect walking, standing, sitting, bending, stooping, and climbing, the Court rejects plaintiff's step five arguments.

2. Plaintiff's Alleged Mental Impairment

Plaintiff alleges the ALJ found moderate limitations to plaintiff's social ability, and in her concentration, persistence, or pace, yet "improperly omitted these limitations from his hypothetical." (Dkt. # 12 at 3). Plaintiff also argues the ALJ failed to perform the "special technique" required of mental impairments found to be severe, but not meeting a listing. See 20 C.F.R. § 416.920a. This argument does not have sufficient merit to reverse the ALJ's decision or to remand for further proceedings.

A review of the ALJ's decision clearly shows application of the "special technique" required by the regulations. (R. 270-271). He found plaintiff to be mildly restricted in activities of daily living, reporting she is able to care for her own personal needs, clean house, cook, care for two dogs, do laundry, visit, read, and shop; moderately restricted in social functioning, reporting plaintiff is able to go shopping and visit, but that she does not like to be around people; and moderately restricted with regard to concentration, persistence or pace, reciting Dr. Vaught's report that plaintiff had no abnormalities in this area. The ALJ found plaintiff had experienced no episodes of decompensation. He stated the "paragraph B" criteria were not satisfied because plaintiff had no "marked" limitations, or even one "marked" limitation with one episode of decompensation. He found the evidence failed to establish the presence of "paragraph C" criteria, stating "[t]here is no medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities. (R. 271). The ALJ then noted the limitations identified in his "paragraph B" criteria

15

were not a RFC assessment, and stated "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." Id.

In his RFC discussion, the ALJ discussed the mental consultative examination by Dr. Vaught:

> The claimant was cooperative, speech was intelligible, fluent and coherent and there were no obvious thought difficulties. Affect was appropriate and mood was euthymic. The claimant had no abnormalities with concentration or persistence and memory and judgment were intact. A diagnosis of adjustment disorder with anxious mood (provisional) was determined. (Exhibit 4F).

(R. 273). He used this consultative exam to form his opinion that:

> In regard to the claimant's mental health impairments, a consultative examination in 2005 found only a diagnosis of adjustment disorder with anxious mood (provisional). There are no records of any further treatment for her alleged mental impairments and there is no indication the claimant takes any medications designed to treat psychiatric or mental symptoms.

(R. 274). Despite the mostly normal findings of the consultative examination, the ALJ still found plaintiff limited. See *supra.* The undersigned finds substantial evidence supports the ALJ's determination.

**Credibility Assessment**

Plaintiff's final argument is that the ALJ failed to perform a proper credibility analysis. This argument is unfounded. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation and citation omitted). The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not

credible." Id. The Commissioner argues the ALJ can look at objective factors, such as attempts to find relief, use of medications, regular contact with doctors, and daily activities when determining a claimant's credibility. Luna v. Bowen, 834 F.2d 161, 165-66 (10th Cir. 1987).

The ALJ listed plaintiff's sporadic prior work history (R. 275), and the fact that her doctors frequently discussed smoking cessation with plaintiff, yet she failed to comply (R. 274). The ALJ also listed plaintiff's lack of compliance with prescribed medication, instead using over the counter medicine id., and the fact she last visited a doctor in February, 2006 for her heart condition. Id. The ALJ noted plaintiff provided no evidence she had tried to obtain health care and been denied, stating if her symptoms were as debilitating as she alleged, she would have exhausted all avenues, including "indigent" health care facilities run by government agencies. Id. In light of the deference afforded the ALJ on the issue of credibility and the fact that the ALJ did cite to specific evidence which could fairly be interpreted as creating a credibility issue, the Court finds the ALJ's credibility determination to be supported by substantial evidence.

## **Conclusion**

For the above stated reasons, this Court AFFIRMS the Commissioner's denial of Disability Insurance Benefits.

SO ORDERED this 27th day of March, 2012.

_____
T. Lane Wilson
United States Magistrate Judge